**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 24 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DORZELL EVERETT KING, SR.,

      Defendant-Appellant.

No. 00-6216
(D.C. No. CR-00-07-T)
(Western District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **BALDOCK**, Senior Circuit Judge.

By indictment Dorzell Everett King, Sr. ("King") was charged in a one count indictment with possessing and concealing $48,000 in counterfeit Federal Reserve Notes of the United States with an intent to defraud in violation of 18 U.S.C. § 472, which notes, according to the indictment, were found in the trunk of King's car when he was stopped by the Oklahoma Highway Patrol. King filed a motion to suppress the use at trial of "all physical evidence, oral statements and fruits thereof, obtained as a result of an

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.

illegal traffic stop, search, and arrest of defendant." At an evidentiary hearing on the motion to suppress, the arresting officer, Trooper Brett Sayre ("Sayre") of the Oklahoma Highway Patrol assigned to the Special Operations Division, testified concerning his stop and search of the vehicle King was driving. In a six-page order the district court denied King's motion to suppress, and explained its reasons therefor. King later entered a conditional plea of guilty, reserving his right to appeal the district court's denial of his motion to suppress, pursuant to Fed. R. Crim. P. 11(a)(2). King was thereafter sentenced to 24 months' imprisonment, three years' supervised release, and a $100 special assessment. King appeals the district court's denial of his motion to suppress.

On an appeal of a district court's denial of a defendant's motion to suppress, our standard of review is to accept the district court's findings of fact unless such are clearly erroneous, and to view the evidence in the light most favorable to the government. *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990). However, the ultimate question of the reasonableness of a police officer's actions, as required by the Fourth Amendment, is one of law which we review *de novo*. *United States v. Ross*, 920 F.2d 1530, 1533 (10th Cir. 1990). In determining whether the initial stop of a motor vehicle by a police officer is reasonable under the Fourth Amendment, the government is not required to show that a traffic violation actually occurred; rather, it is sufficient to show that the officer making the stop has a "reasonable, articulable suspicion" that a traffic violation has occurred, or was occurring. *United States v. Hunnicutt*, 135 F.3d 1345,

1348 (10th Cir. 1998) (citing *United States v. Botero-0spina*, 71 F.2d 783, 787 (10th Cir. 1995)).

After briefing and an evidentiary hearing, the district court concluded that the initial stop of King's vehicle by Sayre was valid under the Fourth Amendment. In so doing, the district court accepted the testimony of Sayre that the reason he stopped King was that he was following the vehicle ahead of him at a distance of about 35 to 40 feet while driving 70 miles per hour, which Sayre, based on his training and experience, said was "too close" and that a "safe distance was at least 140 feet." The district court's holding that Sayre's stop of King's vehicle was reasonable under the Fourth Amendment is supported by the record and is in accord with applicable authorities. The district court was not persuaded by a suggestion that the reason given by Sayre for stopping King was pretextual, and that the real reason was drug interdiction or because of King's racial profile. (King is an African-American).[1] There remains the further contention of King's counsel that the ensuing detention of King "far exceeded the scope of the traffic stop" and therefore violated the Fourth Amendment's prohibition against "unreasonable searches and seizures."

As indicated, Sayre testified at length at the hearing on the motion to suppress.

---

[1] A videotape of Sayre's stopping and searching of King's vehicle, which included other stops made by Sayre the previous day, was before the district court. It was in his cross-examination of Sayre that counsel suggested the stopping was pretextual or based on a racial profile.

Apparently, he was the only witness at the hearing. Sayre, after detailing his training and experience, testified, as indicated, that he stopped King because he was following another vehicle "too closely." After making the stop, Sayre got out of his vehicle and walked to the stopped vehicle and "made contact with the driver." He stated that King produced a driver's license, and said the vehicle was a rental, but was unable to produce any rental agreement. In connection therewith, King said "he might have left it at home or maybe his wife had it in order to contact the company regarding a dent in the vehicle." Sayre then asked King to come back and sit in Sayre's vehicle, which he did, while he wrote a warning ticket. King was then seated in the front passenger seat of the police car. In conversation between the two, King stated that he was in route to Dallas to visit a cousin and that he was in "auto sales." Sayre testified that King was "foot tapping" and seemed "unusually nervous," even after being advised that he was only going to get a warning ticket. After giving King the warning ticket, Sayre returned to King's vehicle in order to get a "green piece of paper from National Car Rental," which had the phone number of National Car Rental thereon. Sayre then returned to the police car where he intended to call National Car Rental and also run a check on King's driver's license. While waiting for a return on the driver's license check, Sayre got his dog out of his car

and proceeded to "walk" around King's vehicle to "scan the air around it."[2] According to Sayre, the dog "alerted" to narcotics at the right rear part of the car. Sayre then decided to search the vehicle. The search of the inside of the vehicle apparently revealed nothing of any importance, but when Sayre "popped" the trunk, and after removing the cover over a spare tire, he saw a "black trash bag" which contained "five bundles of what I thought was just regular money at the time." The dog later jumped into the trunk and alerted. After Sayre's partner arrived at the scene, Sayre testified that "we looked at the money a bit closer and determined that it was probably counterfeit," and that he arrested King and "transported him to jail." At the jail, after a Miranda warning, King stated that the "money" was his and that "he made it on a laser printer."

As a starting point in our consideration of whether King's detention was unreasonable, even though the initial stop was reasonable, we have held that a police officer, during a routine traffic stop, may request a driver's license and a vehicle registration, run a computer check on the car and driver, and issue a citation, but that "if the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning." *United*

_____

[2] Sayre testified that his dog was trained to alert to five major odors: marijuana, cocaine, methamphetamine, hashish and heroin. In this general connection, Sayre further testified that in about seven out of ten times his dog alerted, drugs were found; that in two out of the three remaining times that his dog alerted, no drugs were found, but there was an "explanation" therefor; and that in one out of ten times his dog alerted, no drugs were found and there was no explanation as to why the dog had alerted.

States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993), citing, *inter alia*, *United States v. Pena*, 920 F.2d 1509 (10th Cir. 1990).  In the instant case, although King produced a valid driver's license, he failed to produce any "proof of right to operate the vehicle," and such distinguishes this case from *Soto, Pena*, and others.

In concluding that Sayre's "detention" of King was, under the circumstances, "reasonable," the district court noted that the videotape showed that the stop was made at 9:33 a.m. and the counterfeit Federal Reserve Notes were seized at 9:58 a.m.  The district court mentioned that King's inability to produce any rental agreement or otherwise prove his right to operate the vehicle justified "further questioning" of the driver.  The district court then referred to King's "nervous demeanor and his hesitation to answer questions."  Finally, the district court emphasized the "dog's alert" and held that all things considered, Sayre had probable cause to search the vehicle without a search warrant.

We are in general accord with the district court's analysis of the "detention issue."  The fact that King could not produce any rental agreement justified some detention for the purpose of further inquiry into his right to operate the vehicle.  *See United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994) (listing a number of cases where a "defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle . . . [gives] rise to an objectively reasonable suspicion that the vehicle may be stolen.") .  Nervousness may be considered, although, standing alone, is certainly not decisive. *Id.*  Running the dog around the

vehicle while waiting for the results of a check on King's driver's license, and before completing a call to National Car Rental, was not improper. *See United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990) (holding that an individualized reasonable suspicion of drug-related criminal activity is not required when the dog sniff is employed during a lawful seizure of the vehicle). The record indicates that the dog "sniffed" King's car during the time when Sayre was awaiting the check of King's driver's license, and that the dog alerted to the rear part of the right hand side of King's vehicle. Such, in our view, justified a search of the vehicle, including the trunk.[3]

In *United States v. Nielsen*, 9 F.3d 1487 (10th Cir. 1993), we reversed the district court's denial of a motion to suppress the use at trial of drugs found in a search of the trunk of a vehicle. The search there was based on the fact that the officer, who had stopped the defendant because he was speeding, recognized the smell of burned marijuana coming from the open window of the stopped vehicle. In *Nielsen*, we held that the "smell" was not sufficient to justify a warrantless search of the trunk. However, in so doing, we spoke as follows:

> If this were the case of an alert by a trained drug sniffing dog with a good record, we would not require corroboration to establish probable cause. The dog would have no reason to make a false alert. But for a human sniffer, an officer with an incentive to find evidence of illegal activities and

---

[3] It would appear that at the time Sayre's dog "sniffed" King's vehicle, Sayre had not yet attempted to call National Car Rental, although he did so shortly thereafter, but was unable to complete the call.

to justify his actions when he had searched without consent, we believe constitutional rights are endangered if limitations are not imposed.

*Id.* at 1491.

In *Nielsen*, we also spoke as follows:

Accordingly, the Tenth Circuit and the United States Supreme Court have made it clear that "when a legitimate search is underway . . . nice distinctions between . . . glove compartments, upholstered seats, trunks, and wrapped packages . . . must give way to the interest in the prompt and efficient completion of the task at hand." *Loucks*, 806 F.2d at 210 (quoting *Ross*, 456 U.S. at 821).

*Id.* at 1489.

All things considered, we agree with the district court that the search of King's vehicle and the seizure of the counterfeit money was not "unreasonable" and did not violate the Fourth Amendment.[4] Under the circumstances, there was probable cause to search the trunk of King's vehicle, and a warrantless search was justified. The fact that no drugs were found, and the only contraband was counterfeit money, is not of any particular significance. There were several possible explanations of why the dog alerted.[5]

Judgment affirmed.

---

[4] We do not believe that the recent case of *City of Indianapolis v. Edmond,* 531 U.S. 32 (2000) has particular present applicability. That case involved a checkpoint program whose primary purpose was to detect evidence to interdict possession of unlawful drugs. That is not the present case.

[5] In this connection, *see United States v. McCranie*, 703 F.2d 1213 (10th Cir. 1983) (upholding a seizure of drugs following a dog sniff even though the dog had been trained to locate explosives). In *McCranie*, the trial judge opined that the dog there in question "minored in drugs and majored in explosives." *Id.* at 1216.

Entered for the Court

Robert H. McWilliams
Senior Circuit Judge